In the Interest of Elizabeth R. GREENE [1] dob 07.02.97 Hannah L. Greene dob 10.22.98.

Nos. CS05–03050, CS03–06749.

Family Court of Delaware.

Submitted: June 29, 2006.
Decided: Sept. 21, 2006.

Paul Enterline, Georgetown, DE, for Petitioner.

Bruce A. Rogers, Georgetown, DE, for Respondent.

## OPINION

HENRIKSEN, J.

Pending for decision by the Court are two Petitions for Visitation concerning the above-named minor children. One of the petitions was brought by the children's 28–year–old mother, Melissa Greene. Melissa

---

1. Pseudonyms have been used to protect the identity of the parties involved.

Greene (mother) was found guilty in December 2005 of Murder By Abuse or Neglect for having placed her approximately one-hour-old newborn baby on the doorstep of her alleged paramour on January 28, 2003. She was convicted and sentenced in the Superior Court for 40 years at Level 5, the first 15 years of which are a mandatory term of incarceration. Under the terms of her December 2005 Sentencing Order, she was also required to have no contact with John Davidson, the alleged father of the child, be evaluated for substance abuse and follow-up recommendations for counseling, testing, and treatment, and be evaluated for emotional and psychological problems with follow-up treatment and counseling.

The children's 52–year–old maternal grandmother, Margaret Hayes (grandmother), had also filed a Petition seeking grandparent visitation.

Mother seeks limited visitation, supervised at the corrections facility, consisting of one hour per month, which may be expanded over time with mother's participation in the Reach Program. The Reach Program is designed to facilitate visitation and contact between incarcerated mothers and their children. Grandmother seeks limited visitation. She would like to be able to facilitate the transportation of the children to and from the prison for mother's visitation with the children. If the Court does not allow mother to have visitation, grandmother then seeks a certain amount of limited contact in her own right.

The children had been in both mother and father's care until May 16, 2003, when an *Ex Parte* Emergency Order was rendered from this Court awarding temporary custody of the children to the Division of Family Services (DFS). Testimony at the present hearing indicated the children were first placed by DFS on that date into the care of their maternal grandmother, Ms. Hayes. However, after a search of DFS records, DFS determined that Ms. Hayes had at one time been substantiated for abuse of a child when she struck her daughter, Anna, across the face, leaving a mark from her ring approximately the size of a nickel around Anna's mouth. DFS records also indicated that Ms. Hayes' then husband, Richard Hayes, had been substantiated for sexual abuse of their daughter Anna. Once this information was discovered, DFS immediately removed the children from maternal grandmother's care and placed them into a foster home where they remained for a brief time until a preliminary protective hearing was held before this Court on June 13, 2003. The Court's Dependency Neglect hearing of June 13, 2003 resulted in an Order returning the children to father's care and providing that any contact between the children and mother would only be supervised at the visitation center, or supervised in the home of the children's paternal grandmother, Audrey Norman, by the children's father or Ms. Norman. The Court's June 13, 2003 Dependency Order is the only Order that the Court has issued concerning these children as between mother and father.

On February 11, 2006, mother filed a Petition seeking to modify her visitation rights. Maternal grandmother filed her Petition for Visitation on November 23, 2005.

On March 9, 2005, the Superior Court amended mother's bond requirements to provide that she was to have no contact with father or with Tracy Stone, a friend of mother's who helped her deliver the abandoned infant to the doorstep of the infant's purported father.

In arriving at its decision, the Court considered the testimony of each of the parties, as well as Edith Gaston, a friend of maternal grandmother's who recalled

maternal grandmother's considerable involvement with the children in their soccer league; Kelly Hankins, who had observed a considerable amount of positive interaction between maternal grandmother and the children in soccer play and at maternal grandmother's home; Stuart Johnson, the children's therapist from People's Place; and Beverly Ellis, the DFS investigator who was involved in the removal of the children on May 16, 2003. The Court also interviewed the children in separate, private, recorded conversations.

## FACTS

Based upon the testimony heard by the Court, the Court has no doubt that maternal grandmother was heavily and particularly involved in the children's lives from the moment of their birth until October 30, 2004 when father informed her she was to have no further contact with the children. Since maternal grandmother had posted mother's bond and mother was living with maternal grandmother, maternal grandmother indicated that she believed she might jeopardize her daughter's bond if she pursued contact with her grandchildren at that time.

Maternal grandmother is also the mother of now 18–year–old Anna and 17–year–old Toby, as well as the stepmother of 23–year–old Jamie, who also has a child, nine-year-old Adam. Both Anna and Toby were involved in soccer. Maternal grandmother always took Elizabeth and Hannah to Anna and Toby's soccer games and practices, and maternal grandmother eventually formed a special soccer league for children under four years of age so that Elizabeth and Hannah could be involved in soccer. Maternal grandmother was present for the children's births, saw them on an almost daily basis, and for a period of time, served as the children's caretaker while the parents worked.

Edith Gaston, a friend of maternal grandmother's and officer and coach of the soccer league, testified to the positive interaction between maternal grandmother and these children, noting that maternal grandmother kept these children active and busy, and that the children loved and enjoyed their maternal grandmother. Ms. Gaston's only comment as to mother was that she often saw her at soccer games, but that she saw maternal grandmother with the children more than mother. According to Ms. Gaston, father appeared occasionally at the soccer games.

Kelly Hankins, whose own child was in soccer, echoed the positive comments Ms. Gaston made about maternal grandmother's interaction with the grandchildren, including after-game events which took place in grandmother's home. Ms. Hankins described the children as very loving. Ms. Hankins made little comment, if at all, on mother's interaction with the children.

As noted, grandmother has not had any contact with her grandchildren since October 30, 2004, when father informed her that she was no longer invited to have contact. Approximately one year later, grandmother sent letters to father indicating that she wanted to be able to visit with her grandchildren. Grandmother then filed her Petition seeking visitation on November 23, 2005.

## LAW AND REASONING

### 1. Grandmother's Visitation

When the Court issued a Dependency Neglect Order on June 13, 2003, placing the children in father's care with mother's contact only allowed with supervision, the Court, without specifically stating it was issuing a sole custody Order, granted *de facto* sole custody to father. Following mother's arrest on September 13, 2004, and father's decision not to allow

mother to have contact with the children on or around October 30, 2004, and clearly since mother's incarceration in December 2005 on a 40 year sentence with a mandatory 15 year minimum, father has been the sole parent who is making decisions for these children, and he is the sole parent who will continue to make the decisions for the children until they are 18 years of age.

The Delaware Legislature has stated that grandparents may be awarded reasonable visitation rights.[2] Furthermore, the Legislature has provided, *"That wherever practicable, the Court shall provide that the maternal grandparents' visitation time shall occur when the child is placed with or has visitation with the mother ..."*[3] The Delaware Supreme Court has placed the burden on the grandparents seeking visitation to establish by a preponderance of the evidence that visitation with the grandparents is in the best interests of the child.[4] In the decision, the Delaware Supreme Court added, *"That the criteria found in 13 Del.Code, § 722 and 727 (although drafted to apply to custody and to parental visitation matters) are helpful in determining the factors to be considered in determining the 'best interests of the child' as that phrase may be applied in connection with visitation by a grandparent."*[5]

The United States Supreme Court has ruled that where the custodial parent of the grandchild at issue is fit, the custodial parent's decision about whether to grant the grandparent visitation must be afforded great weight.[6] The Delaware Family Court has adopted the position of the Unit-

ed States Supreme Court, also requiring that the decision of a fit parent about whether or not to grant grandparent visitation must be afforded great weight.[7]

▇▇ Thus, in a case where grandmother had no contact with her grandchild since the child's first birthday, and it had been more than two years since grandmother made any attempt to contact her grandchild making grandmother a stranger to the child, the Family Court denied grandmother's visitation request.[8] Thus, grandparent visitation is not automatic nor is it guaranteed. In the present case, maternal grandmother must show that the visitation is in the children's best interests.

There has been no suggestion that father is an unfit parent. Accordingly, his concerns and his opinion about whether maternal grandmother should have visitation at this time with his children is to be given great weight. For the past two years, father has been living with his girlfriend, Melinda. The girls indicated that they view Melinda as their mother, and it appears that father and Melinda, although not married, are involved with the children as a family unit. The children are doing fairly well in school. The Court is somewhat concerned that, in father's care, the children are not necessarily involved in any extracurricular activities, although they would like to play soccer. Soccer was the activity introduced to them by their maternal grandmother. Father is concerned that the children never talk about their grandmother, and have not seen her for several years now, at least since Octo-

---

2. 10 DEL. CODE ANN. § 1031(7).

3. 10 DEL. CODE ANN. § 1031(7)(b).

4. *Rosemary E.R. v. Michael G. Q.*, 471 A.2d 995 (Del.1984).

5. *Rosemary E.R. v. Michael G. Q.*, 471 A.2d 995, 996–997 (Del.1984).

6. *Troxel v. Granville*, 530 U.S. 57, 69–70, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

7. *M.S.G. v. L.H.H.*, No. CN01–10239, 2003 WL 23269513 (Del.Fam.Ct. Oct. 3, 2003).

8. *Id.*

ber 2004. Although father also expressed his concern about the number of seat belt violations maternal grandmother has incurred in the last few years-five of them-the Court could not help but note that father has also had his share of seat belt violations, child restraint violations, and speeding tickets.

The children both remember their maternal grandmother. Although they might not admit it, they gained a love of soccer from their maternal grandmother. The Court believes that until these children's mother committed her despicable act, maternal grandmother was a beneficial source of inspiration in each of these children's lives. Also involved in these children's lives when maternal grandmother was still seeing them, were maternal grandmother's 18–year–old daughter, Anna, and 17–year–old son, Toby, as well as maternal grandmother's 23–year–old stepdaughter, Jamie, and her nine-year-old son, Adam. Anna and Toby continue to reside with maternal grandmother and Jamie lives nearby. All of these persons were at one time significant individuals in the lives of these children. Unfortunately, in the almost two years that have passed since the children last saw their maternal grandmother or her children, Elizabeth and Hannah's memories have faded about these people.

Elizabeth indicated that maternal grandmother's home was a trashy house, although the Court saw nothing in the pictures presented to the Court, or testimony of others, to indicate that maternal grandmother kept a trashy house. Elizabeth spoke fondly of the time when she played soccer and maternal grandmother was her coach. She even received a trophy that year. The only thing she could recall about Anna was that she was a girl who always stayed in her room. Elizabeth recalled nothing about Toby. The only thing she remembered about Jamie was that she had a son named Adam. Although there was no testimony by any other individual about maternal grandmother's possible relationship with men, the Court found it alarming that Elizabeth had heard from her father or Melinda that maternal grandmother had been sleeping with several different men that she had picked up at bars. This is obviously a thought that has been placed into this child's young mind by father or Melinda, and it is most unfortunate. Elizabeth indicated that she did not want to visit maternal grandmother, and that she became frustrated when the subject was mentioned to her by her counselor, Stuart Johnson. Elizabeth is almost nine years of age. She would have been seven when she last saw her maternal grandmother.

Hannah had just turned six when she last saw her maternal grandmother. Hannah is presently not involved in any extracurricular activities. She recalled that she liked playing soccer, although she could not recall who taught her to play. Hannah indicated that she did not want to see her mother or maternal grandmother because she said they were mean. Hannah also said that her maternal grandmother, because she was divorced from her husband, was just like her mother, who had cheated on her father. She recalled maternal grandmother's daughter Anna, and said that Anna looked like a boy and that she dated another girl at the prom. She said that Anna was both mean and nice to her. Her recollection of Toby was that he was nice, that she liked him, that he watched out for her, and that he played soccer with her. Although Hannah did not remember her maternal great-grandmother when the Court showed her a photograph, Elizabeth remembered her maternal great-grandmother and was aware that she had died about a year ago. Hannah told the Court that she did not want any visits or telephone contact with her maternal grand-

mother, but that receiving cards from her would be okay.

Hannah appeared to be in good health, except that it seemed that she needed dental care for her front teeth which protrude in different directions. Elizabeth told the Court that at one time she was not healthy because she ate too much junk food when she lived with her mother and father. She stated that she now only eats good food.

Given the characterization of other witnesses about maternal grandmother's active play environment in which she involved the children, it would be difficult for the Court to believe that maternal grandmother contributed to any unhealthy situation concerning Elizabeth or Hannah. If anything, the Court has some concern about the lack of activity in which these children are presently involved. The Court also notes that when mother and father were making decisions concerning the children, it was the maternal grandmother who made sure the children were involved in sports activities.

If maternal grandmother was substantiated for abuse, it was done before the Child Abuse Registry was created. Former DFS worker Beverly Ellis testified about her recollection of being informed by another DFS worker that DFS records demonstrated that maternal grandmother had been substantiated for physical abuse of Anna. Ms. Ellis never actually saw the record of substantiation. Maternal grandmother indicated she was not aware that she had been substantiated. She did recall, however, an incident approximately 18 years ago when she was investigated because she struck Anna across the face which resulted in an imprint/bruise the size of a nickel near Tempest's mouth. If maternal grandmother's former husband,

Richard Hayes, was substantiated for sexual abuse, he no longer resides in maternal grandmother's home since they are divorced. There was no records keeper from DFS to give certainty to the question of whether or not DFS records contained a record of maternal grandmother's substantiation for physical abuse. If it does, however, the Court notes that this would have occurred over 18 years ago. Testimony by those individuals who observed maternal grandmother's interaction with these children was extremely positive.[9]

Maternal grandmother indicated she was healthy, except that she takes medication for high blood pressure and cholesterol. The Court heard nothing negative by way of any health problems or criminal history as to the other children, all of whom father interacted with at one time.

Stuart Johnson, the children's counselor, spent 13 sessions with the children since he first saw them on March 22, 2006. He purposefully kept father out of the sessions, except for the initial intake session. Mr. Johnson emphasized that he was a counselor for the children, not for the parents. Although Mr. Johnson stated that the children were fairly flat in their responses about maternal grandmother, it appeared the greater thrust of the children's fears was the possibility of visiting their mother in prison. He recommended that mother have no visitation at this time, but perhaps a rapport could be established in the future when they are teenagers if they possibly express an interest in having contact with their mother. Mr. Johnson stated that Court-ordered visitation at this time with mother would be stressful for the children and create problems such as nightmares. If there was going to be visitation with mother, Mr. Johnson stated

---

9. In response to a Court Order, DFS supplied records concerning Margaret Hayes and Richard Hayes. The records have been reviewed by the Court and have been sealed.

that he hoped it would be gradual, starting first with letters, followed by telephone calls, and then seeing where that goes. He also recommended that any visits with maternal grandmother start in the same manner.

Mr. Johnson said that Elizabeth was angry because she knew that her mother had had a baby by someone else and her mother had killed the baby. Mr. Johnson could not say that visitation by the children with their mother or with maternal grandmother would scar them for life so long as there was a gradual introduction. He felt there should be a minimum of at least six months before any face-to-face contact occurred. In Mr. Johnson's opinion, if maternal grandmother and mother were introduced to the children on a gradual basis, visitation by maternal grandmother and mother would probably not be harmful, although it might be stressful.

All in all, it is clear to the Court that the involvement of the maternal grandmother in the lives of these children until Elizabeth turned seven and Hannah turned six, was beneficial to these children and in their best interests. It has been almost two years since maternal grandmother has seen the children and their memories of her have faded. The Court is concerned, however, that their memories may have been somewhat jaded by perceptions given to them by father and his girlfriend, Melinda. This is regrettable. The children expressed to the Court their wish not to have contact with their maternal grandmother, although Hannah said she would not mind receiving cards from her maternal grandmother. The Court does not believe that either of these children demonstrated sufficient maturity or clarity in their reasoning to cause the Court to believe they had appropriate reasons for not wanting to see their maternal grandmother at this time. Although the Court has given great weight to father's opinion on this matter, father was also willing to defer to the judgment of the Court and to Mr. Johnson as to what was in his children's best interests. Given the prior extensive, positive benefit maternal grandmother had on these children's lives, the Court believes that maternal grandmother has met her burden of proof to demonstrate that she should enjoy contact and eventual visitation with her grandchildren.

### 2. Mother's Visitation

■ The Court now turns to mother's request for visitation with her children. The Court heard little testimony about mother's interaction with these children prior to her incarceration. Elizabeth remembered that her mother kept a filthy house and, indeed, DFS worker Beverly Ellis stated that this was a concern of the Division in April of 2003. Elizabeth remembered that her mother did not cook dinner or do laundry; instead, Elizabeth remembered her father performing these chores when he returned home from work. It was most interesting to the Court that Hannah, when showed a group family soccer picture taken in 2002, did not recognize her mother in the picture, even after the Court specifically asked Hannah whether her mother was in the picture.

Both children understand that their mother killed an hour old baby, or at least that she abandoned the baby on someone's doorstep in the cold of winter. Furthermore, each of the children understand that their mother had a baby with a man other than their father, and, in their words, their mother cheated on their father.

Given mother's conviction for Murder by Abuse or Neglect of a Child in the First Degree, it seems almost needless to discuss mother's other driving and/or criminal record. However, while mother was on bond awaiting trial for the criminal charge,

she violated a seat belt law on May 29, 2005. In August of 2004, mother pled guilty to Careless Driving. She also has various charges of Driving While Suspended or Revoked, as well as Bad Check and Theft charges in October 2003.

Although the Superior Court's Sentencing Order of December 19, 2005 required mother to be evaluated for substance abuse and emotional/psychological problems, mother has not yet been evaluated for substance abuse and has only recently been evaluated for emotional/psychological problems.

Mother had supervised visitation at the visitation center for 6 months. However, the visitation center terminated mother's visitation because mother had accumulated an unpaid bill. She had been allowed visitation for 1–1/2 hours per week.

Generally, Delaware law requires that the non-placement parent be awarded visitation which is, "... *consistent with the child's best interests and maturity, which is designed to permit and encourage the child to have frequent and meaningful contact with both parties unless the Court finds, after a hearing, that contact of the child with one parent would endanger the child's physical health or significantly impair his or her emotional development.*" [10] In making a decision on visitation, the Court also considers the best interest standards set forth in 13 Del.Code Ann. § 722:

(a) The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child. In determining the best interests of the child, the Court shall consider all relevant factors including:

(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;

(2) The wishes of the child as to his or her custodian(s) and residential arrangements;

(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;

(4) The child's adjustment to his or her home, school and community;

(5) The mental and physical health of all individuals involved;

(6) Past and present compliance by both parents with their rights and responsibilities to the child under § 701 of this title; and

(7) Evidence of domestic violence as provided for in Chapter 7A of this title; and

(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.

(b) The Court shall not presume that a parent, because of his or her sex, is better qualified than the other parent to act as a joint or sole legal custodian for a child or as the child's primary residential parent, nor shall it consider the conduct of a proposed sole or joint custodian or primary residential parent that does not affect his or her relationship with the child. (59 Del. Laws, c. 569, § 4 (1974); 67 Del. Laws, c. 236, §§ 2, 3 (1990); 69 Del. Laws, c. 309, § 3 (1994)).

However, in circumstances such as mother's, where she has been convicted of

---

**10.** 13 DEL. CODE ANN. § 728(a).

a felony offense against her one-hour-old son, mother falls within the definition of a perpetrator of domestic violence as set forth in 13 Del.Code Ann. § 703A (b)(1). Under 13 Del.Code Ann. § 708A, it is clear that any visitation awarded by the Court to mother must be at a location and under conditions that best protect the children from further violence. If the Court were going to award mother supervised visitation at the Baylor Women's Center, the Court believes that such visitation would provide an appropriate location and conditions which would protect the children from further violence.

These children are now nine and seven. They were six and five when they last saw their mother, and they were five and four when they were taken from their parents' home and placed into DFS care. Although neither child set forth a legitimate basis for not wanting to visit their maternal grandmother, they did set forth legitimate reasons for not wanting to visit their mother. Furthermore, Elizabeth remembers her mother, but she does not remember her in a positive way. Hannah could not recognize her mother in a group soccer picture taken in 2002. Both of the children were aware, however, that they were visiting with their mother at the visitation center between February and August of 2004. Both were able to recognize and identify photographs of their visitation with their mother at the center during that time period.

One Family Court Judge has held that where a parent was convicted of manslaughter of a child's sibling, the Division of Child Protective Services was not required to offer reunification services to that parent in order to assist the parent in getting their child back.[11] Mother's despicable act, for which she was convicted of a felony, would be grounds under Delaware law to terminate her parental rights.[12]

There have been several Delaware cases which have analyzed the requests by incarcerated parents, usually fathers, to have visitation of their children. The pivotal case in this area was the Delaware Supreme Court decision in the case of *Ruggles v. Riggs.*[13] In *Ruggles*, the lower Court had allowed visitation of a seven and five year old at the prison where the putative father was serving a 20 year jail sentence. The lower Court record demonstrated little in the justification for the lower Court Judge having awarded such visitation. In overturning the lower Court's grant of visitation, the Delaware Supreme Court noted that in deciding such a case, the Court must consider the best interests and welfare of the children. The Supreme Court also emphasized that in considering those best interests, the Court must give special attention in noting that it is forcing young children to visit someone in prison. The Supreme Court in *Ruggles* went on to note that if the visitation was not determined to be harmful, it would then be reasonable. In *Ruggles*, the Court noted that the Court should consider the parent's fitness as a role model, whether or not any testimony indicated that the visits would be detrimental, the reasonableness of the visitation, and the children's best interests, including the children's physical health and emotional well-being. In *Ruggles*, the Delaware Supreme Court also believed it important that the Court order a psychological evaluation to determine the emotional impact prison visitation would have on the children.

**11.** *In re Ann Margaret Phillips,* 806 A.2d 616 (Del.Fam.Ct.2002).

**12.** 13 DEL. CODE ANN. § 1103(a)(4).

**13.** *Ruggles v. Riggs,* 477 A.2d 697 (Del.1984).

In 1992, the Delaware Supreme Court issued another decision in the case of *Winter v. Charles.*[14] In the *Winter* case, the Delaware Supreme Court denied father's visitation where it held that a two-year-old's periodic and ongoing visits in prison were not in the child's best interests, given the eight year lengthy term of father's incarceration. Although agreeing that a parent's visitation rights are a legal and important right, the Delaware Supreme Court in the *Winter* case noted that such rights must yield to the best interests of the child.

Also in 1992, in the case of *Morris v. Morris,*[15] the Delaware Supreme Court denied visitation of a two-year-old by a father incarcerated for 13 years, noting the poor role model father would present, the serious nature of father's crime, and the tender age of the child.

Delaware Family Court Judges have often denied incarcerated parents visitation where there is a very young child, and where the parent has had no previous meaningful contact with the child.[16] Family Court Judges have also denied visitation to incarcerated parents where the incarcerated parent has indicated by his/her actions that they still pose a threat to the other parent and/or the children either because of their own outward intentions[17] or where the incarcerated parent suffers from serious mental problems in which

that parent harmed the other parent and the children previously, and was later convicted of a terroristic threatening felony for calling in a bomb scare to the Family Court.[18]

In a 2001 decision by Family Court Judge Waserstein, father was permitted visitation by certain children ages six through 16, where father only had a short period of nine to ten months incarceration remaining, even though father had previously harmed both mother and children and had learned that he could hurt mother mentally by hurting his children physically. In this particular Decision, Judge Waserstein allowed visitation at the prison one time per month, noting that some of the children expressed a desire to visit with their father despite what had occurred, and further requiring that the children who had difficulties with the visitation would be prepared by a therapist.

In a well-reasoned decision in 1994, Judge Walls granted prisoner visitation rights to a father who had a two-year sentence remaining on a crime of raping the child's mother.[19] The children were one and one-half to three years of age. In that case, although mother believed that a prison was no place for her children to visit, mother admitted that the visits would not create any emotional harm for her children. Father pointed out that there

14. *Winter v. Charles*, 608 A.2d 731 (Del.1992).

15. *Morris v. Morris*, 610 A.2d 726 (Del.1992).

16. See *Phillip S.R. v. Rita A. W.*, Del.Fam. Ct., File No. CN95–08989, 1996 WL 798773, Crowell, J. (Aug. 21, 1996), (Fifteen month old child/eighteen month term) and *William F.B. v. Donna L.C.*, Del.Fam. Ct., File No. CV94–07271 (95–26981), 1996 WL 862377, Tumas, J. (Oct. 10, 1996) (Three year old and three more year term).

17. *William F.B. v. Donna L.C.*, Del.Fam. Ct., File No. CV94–07271 (95–26981), 1996 WL 862377, Tumas, J. (Oct. 10, 1996) (father

threatened to kill mother during present visit).

18. *Mara C.D. v. Paul C.*, Del.Fam. Ct., File No. CN96–7446, 1997 WL 878688, Crowell, J. (July 25, 1997). See also *Juli B.F. v. Clarence S. M., Jr.*, Del.Fam. Ct., File No. CN95–08172 (96–20683), 1997 WL 905956 (Nov. 10, 1997).

19. In re *Taylor M.F. et al*, Del.Fam. Ct., File No. CK91–4685, 1994 WL 811731, Walls, J. (Feb. 15, 1994).

was a special area for father to visit with the children and that he had a good relationship with his children prior to his arrest and that he cared for the children. Mother also stated that she would have no objection to visitation by natural father if he was not incarcerated. As Judge Walls noted in his decision, *"Being in prison, without more, does not preclude the exercise of visitation by a natural parent."*

This Judge entered a decision in 2001 which awarded visitation of a five-year-old son to his father who was incarcerated for at least three more years for the felony level assault against the child's mother, and where the child suffered serious emotional problems, including ADHD, Oppositional Defiant Disorder, and Post Traumatic Stress Disorder. Father, prior to his incarceration, was actively involved as a positive influence in the child's life, and the child wanted to visit with his father.[20]

Having noted the foregoing scenarios, the Court now reviews the various considerations set forth in 13 Del.Code Ann. § 722, concerning the best interests standard:

*Parents' wishes and residential arrangements:* Mother desires to visit with her children at least one time per month with maternal grandmother driving the children to the visitation. Mother is willing to undergo the gradual introduction to visitation as proposed by the children's counselor, Stuart Johnson. It is noted, however, that father opposes any contact with mother, although he indicated he is willing to abide by the Court's Order and only wants the best for his children.

*Children's wishes:* Neither child wishes to have any contact with their mother. The Court believes that not wanting to see their mother who abandoned a day-old baby in the cold of winter, and who was

unfaithful to their father, are legitimate reasons. The Court does not believe the children had any legitimate reasons for not wanting to visit their maternal grandmother.

*Interaction and interrelationship of children with significant others:* There was very little testimony to indicate what type of relationship mother had with the children before she stopped seeing them in October 2004. Except for hearing that mother attended some soccer games, the testimony presented to the Court focused on maternal grandmother's positive interaction with these children. The children expressed some recollection of their maternal grandmother's children, some of which was positive, but expressed no positive recollection of their interaction with their own mother. Stuart Johnson, the children's therapist, indicated that he felt the children had not formed a bond with their mother, but he offered no specific testing procedures to support his observations. Mr. Johnson's observations were based solely upon the children's "flat appearance" when any discussion arose concerning their mother.

*Children's adjustment to visiting the prison and the children's mental and physical health:* Stuart Johnson indicated that the children have a fear of visiting their mother at the prison. They expressed to him a fear that they would be locked up if they visited with their mother. They also told Mr. Johnson that the one month's time they spent in foster care was a particularly frightening time for them because they had been separated from their parents, and had no idea as to why they had been taken from their home. Mr. Johnson indicated that a visit by the children to the prison would be stressful on them, but he could not say such a visit

20. *Rahn v. Norris,* 820 A.2d 1183 (Del.Fam. Ct.2001).

would scar them for life. If there was going to be any contact between mother and the children, Mr. Johnson recommended that it only proceed through a gradual introduction.

*Past and present compliance of both parents with their rights and responsibilities to their child under Title 13, Section 701:* Pursuant to Title 13, Section 701, parents are equally charged with their childrens' support, care, nurture, welfare and education. In addition, as the Court noted at the beginning of this opinion, each parent has the responsibility to encourage their child to have significant and meaningful contact with the other.

Contrary to some of the previously noted decisions which permitted a parent visitation with their children while incarcerated, there was no indication given to the Court that mother had previously served as a positive role model in the children's lives. Mother also failed in her moral obligation to her children by being unfaithful to the children's father. According to father, he thought he was involved in a happy marriage and had a happy family until he learned that mother had been unfaithful to him. The marriage and any stability served by this family thus terminated. Last, and of the greatest concern to the Court, is that mother's commission of such a despicable act of abandoning her one-hour-old child outside in the middle of winter is an act of such serious gravity that the Court doubts the children could ever accept their mother as a role model.

*Evidence of domestic violence:* The Court has already discussed at length mother's conviction of Murder Through Abuse or Neglect.

Since the trial was held on this matter, the Delaware Legislature has proposed new legislation regarding parent visitation in prisons, which was signed into law by Governor Minner on July 10, 2006.[21] Pursuant to this newly enacted law, mother would be prohibited from having visitation at the correctional facility because she committed a felony level offense against a half-sibling of the children and also because she was adjudicated/committed of Murder in the First Degree by abuse or neglect.

## CONCLUSION AND ORDER

Stuart Johnson testified that it would be stressful for the children to visit their mother at the prison. He could not say with certainty that the children would be scarred for life by such visitation. However, the Court can see nothing that serves the best interests of these children by having them have any contact with their

---

**21.** Chapter 388 of Senate Bill 337 at the 2nd Session of the 2006 Second Regular Session of the 143rd General Assembly states:

"(e) Before entering an Order for visitation to be conducted in a correctional facility the court shall in addition to other relevant factors consider the following:
1. The parent seeking visitation in a correctional facility had a substantial and positive relationship with the child prior to incarceration;
2. The nature of the offense for which the parent seeking visitation is incarcerated;
3. Whether the victim of the offense is the child, a sibling of the child, stepsibling, half

sibling, parent, stepparent, grandparent, guardian or custodian of the child; and,
4. Whether the child seeks a relationship with the incarcerated parent.
(f) The Court shall not enter an order requiring visitation in a correctional facility if the person incarcerated has been adjudicated of committing a sex offense or a felony level offense against the child with whom visitation is sought or against any other person listed in paragraph (e) 3 of this section.
(g) The Court shall not enter an order requiring visitation in a correctional facility if the person incarcerated has been adjudicated of committing murder in the first or second degrees."

mother at this time. The Court heard no testimony that mother was previously a beneficial influence in the children's lives. Mother will be incarcerated, at minimum, for the next 15 years of the children's lives. She committed a heinous act in her abandonment of a newborn in the winter cold. She could not possibly serve as a positive role model to the children. Although Mr. Johnson could not say that the children would be scarred by visitation with their mother, the children clearly indicated appropriate reasons for not wanting to have contact with their mother. Contact with mother would also disrupt the balance the children have now attained with their father. Under these circumstances, the Court does not require a psychologist to state with certainty the significant harmful emotional effects visitation would have on these children. Rather, the totality of the circumstances in this case with practical certainty predict the serious and significant emotional harm these children would experience if required to have contact with their mother at this time. Although not in effect at the time of trial, the new Delaware statute also supports the Court's decision not to allow mother to have visitation with the children.

For the reasons already stated, the Court finds it to be in the children's best interests to have visitation with their maternal grandmother.

Accordingly,

IT IS HEREBY ORDERED:

1. Mother's Petition for Modification of Visitation is DENIED. Furthermore, mother is to have no contact or visitation with the children.

2. It is in the best interests of the children that maternal grandmother have visitation with the children proceeding on a gradual basis so that they will become acclimated with their maternal grandmother beginning with correspondence, followed by telephone calls, then supervised visits with their counselor/therapist present, to be followed by unsupervised visitation.

3. Stuart Johnson shall facilitate the visitation awarded to maternal grandmother, and shall use his discretion in making the determination of the progression maternal grandmother's visitation should take, always keeping the best interests of the children as the first priority.

4. Any costs that are incurred as part of the acclimation to visitation process shall be borne by maternal grandmother.

5. Father shall cooperate with the recommendations of Mr. Johnson.

6. Within 4 months from the mailing date of this Order, Mr. Johnson shall provide the Court with a letter report, copying counsel, of what has occurred in the acclimation process between the children and maternal grandmother and what he anticipates for the future.

IT IS SO ORDERED.